UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 6:19-CR-73-CHB-HAI-1 |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION |
| RUSSELL JENKINS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

By Second Superseding Indictment issued January 23, 2020, Defendant Russell Jenkins stands charged with one count of conspiracy to distribute oxycodone pills. D.E. 42. The charges rely on evidence obtained during a warrant-based search of his residence on January 3, 2018.

The 2018 search of Jenkins's residence uncovered, among other things, 25 pills in a small plastic bag. D.E. 40-5 at 2. Although Jenkins was not home when the search began, officers contacted Jenkins and interviewed him after he arrived at his house. *Id.* That interview solicited incriminating statements about Jenkins's alleged trafficking of oxycodone pills. *Id.*

On December 30, 2019, Jenkins, through counsel, filed a motion "to suppress all evidence and statements" obtained as a result of that search. D.E. 33 at 1. The motion also requested an evidentiary hearing "at which all law enforcement personnel involved in the investigation leading to the issuance and execution of the search warrant are present." *Id.* at 6-7. The Court interpreted the motion as arguing that "the state search warrant was not supported by probable cause and lacked an adequate nexus to his residence." D.E. 37. The Court ordered Jenkins to supplement his motion to explain why an evidentiary hearing would be appropriate when a challenge to a search warrant is typically limited the "four corners" of the supporting affidavit. *Id.*

1

On January 7, 2020, Jenkins supplemented his motion (D.E. 33) with a memorandum. D.E. 38. He argued that discrepancies between the executing officer's case report and the affidavit warranted a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). *Id.* at 3. Alternatively, he argued the affidavit was "ambiguous" and so a hearing could "assist the Court in determining its meaning." *Id.* at 5. The government responded in opposition to the motion and argued that no hearing is warranted. D.E. 40. Jenkins filed a reply on February 3, 2020. D.E. 70.

For the reasons discussed below, the Court finds that no hearing is warranted and recommends that Jenkins's motion to suppress be denied on the merits.

## I. No *Franks* Hearing Is Warranted

### A. Legal Standards

When determining whether an affidavit establishes probable cause, courts typically look only to the four corners of the affidavit. *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016). A defendant wishing to venture beyond the affidavit bears the "heavy burden" of demonstrating the need for a *Franks* hearing. *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). The *Franks* standard recognizes that a presumption of validity exists with respect to the affidavit supporting the search warrant. *Id.*

> The type of hearing [Jenkins] seeks has come to be known as a "*Franks* hearing," following the Supreme Court's holding in a case by that name. In a *Franks* hearing, a court determines whether to suppress the fruits of an executed search warrant, where the warrant was the result of a false statement. [*Franks*, 438 U.S. 154, 171 (1978)]. To demonstrate entitlement to the hearing, a defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155-56. "The allegedly false statement," moreover, must be "necessary to the finding of probable cause." *Id.*

> A *Franks* analysis turns on two questions of fact, and one of law. The two questions of fact: One, is there a false statement included in an affidavit? If so, then two, how culpable is the affiant officer in including that statement in the affidavit? Where the affidavit does include a false statement, and where the officer

2

making the statement was culpable in doing so, then the court turns to a question of law: After excising the false statement, is there sufficient information in the affidavit to constitute probable cause to issue a warrant? *Id.* at 171.

*United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019).

The bottom line [in *Franks* was] that an evidentiary hearing on the affidavit's truthfulness was required *only* if the defendant alleged "deliberate falsehood or . . . reckless disregard for the truth." [*Franks*, 438 U.S. at 171]. "Allegations of negligence or innocent mistake," the Court emphasized, would be "insufficient." *Id.* And the allegations of deliberate or reckless falsehood "must be accompanied by an offer of proof." *Id.* Even having satisfied these steps, a defendant must still show that "when material that is the subject of the alleged falsity or reckless disregard is set to one side," the affidavit's remainder no longer demonstrates probable cause. *Id.* at 171-72. Only then is a defendant entitled to a *Franks* hearing to prove his allegations. *Id.* at 172. *Franks* thus drew an evidentiary line with reference to the well-known common-law scienter standards: negligence, recklessness, and willfulness. *See* Restatement (Second) of Torts §§ 8A, 282, 500 (1965). Only "substantial" evidence tending to show one of the two more culpable mental states, *Franks* said, would do.

*Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019). An officer's statement is only considered to be issued with "reckless disregard for the truth" if the defendant shows the affiant subjectively entertained "serious doubts as to the truth" of his allegations. *Bateman*, 945 F.3d at 1008. "Allegations of [an officer's] negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171.

### B. The Affidavit and Case Report

Jenkins argues that discrepancies between the affidavit and the case report show that Kentucky State Police Detective Benjamine Graves (who crafted both documents and swore to the affidavit) made statements in the affidavit that were deliberately false or made with reckless disregard for the truth. D.E. 38 at 3-5. Jenkins focuses on the portions that concern Det. Graves's surveillance near Jenkins's residence on January 3, 2018. According to the case documents, investigators believed Jenkins was the supplier of a dealer named Charles "Chuck" Chadwell.

The narrative in the affidavit states:

The affiant has information that Russell Jenkins is living at 654 South HWY 1223 in Corbin Kentucky. The affiant has received information that Jenkins is distributing Oxycodone in Laurel County. I have spoken with a source of information that advised Jenkins is obtaining Oxycodone pills from a source of supply in Michigan. The source who[se] information I have found to be reliable from past investigations stated He/She had purchased Oxycodone from Jenkins in the past. I have also conducted two controlled purchases where Oxycodone 30MG pills were purchased from Charles Chadwell. I have information that Chadwell was obtaining Oxycodone pills from Jenkins. During both controlled purchases Chadwell was operating a vehicle owned by Jenkins. **On Jan 3, 201[8][1] I observed the vehicle that Chadwell was operating when the controlled purchases were conducted setting in the driveway at 654 South HWY 1223 in Corbin Ky. While conducting surveillance I observed Chadwell on the property of the residence. A short time later I observed Chadwell get into the vehicle and leave the residence.** I had learned from the investigation on Chadwell that he had a suspended license. The Affiant and Tpr Chris Saunders U/930 conducted a traffic stop on the vehicle because Chadwell was operating the vehicle. During the traffic stop Troopers located 96 Oxycodone 30 MG tablets on Chadwells person. **Chadwell advised he obtained the pills from Jenkins that day and confirmed the residence he had come from was Jenkins residence.**

D.E. 40-1 at 2 (emphasis added). The affidavit also states that Jenkins's criminal history contains a conviction for third-degree drug trafficking, first-offense, in a 2014 case. *Id.*

The case report is more detailed. Concerning the January 3, 2018 surveillance, it states:

On Jan 3, 2018 I received a phone call from CI 11-351. The CI stated CHARLES CHADWELL AKA CHUCK was currently at RUSSELL JENKINS residence. The CI stated CHUCK was at the residence doing work for JENKINS but would be obtaining Oxycodone pills from JENKINS while he was there. The CI has provided information in the past that CHUCK would obtain 50 Oxycodone 30MG pills per day from JENKINS. The CI said CHUCK normally is at JENKINS residence during the day working for JENKINS and that during this time JENKINS also obtains Oxycodone pills. The CI stated CHUCK was driving the Ford F150 pickup truck that is registered to JENKINS. The CI stated the vehicle was the same one CHUCK was driving during both controlled purchases that I had previously conducted.

Around 15:30 hours on Jan 3, 201[8] I began conducting surveillance in the area of JENKINS residence at 654 south Hwy 1223 in Corbin Kentucky. **During the time I was conducting surveillance I observed the vehicle CHUCK had been driving parked in the driveway at JENKINS residence. I also observed CHUCK cross the street and go over to some parked cars where it appeared that JENKINS was on a tractor. It appeared CHUCK, JENKINS and another**

---

[1] The affidavit here says "2017," but this is clearly a typographical error. D.E. 40-1 at 2.

**male subject were removing an engine from a vehicle. Around 16:00 hours I observed CHUCK and the male subject leave JENKINS residence in the truck CHUCK has driven in the past.** I observed CHUCK as the operator of the vehicle and had previous knowledge that CHUCK'S operator's license was suspended. I contacted TPR Chris Saunders U/930 to conduct a traffic stop on the vehicle. TPR Saunders was able to stop the vehicle on AG Road. During the traffic stop CHUCK was very nervous and was shaking. I asked CHUCK to step out of the vehicle. **I asked CHUCK where he had come from and he stated JENKINS residence.** I informed CHUCK that I knew he had been obtaining Oxycodone pills from JENKINS and that I had previously conducted multiple controlled purchases from him using a confidential informant. **I asked CHUCK if he was obtaining Oxycodone from JENKINS and he stated yes.** I asked CHUCK if he had any Oxycodone pills on his person or in the vehicle and he stated no and that I could search. I patted Chuck down and located an empty pill bottle in CHUCK'S pocket. The pill bottle was consistent in appearance with the bottle that CHUCK had removed the pills from when he had sold them to the CI when the controlled purchases were conducted. In chuck[']s other pocket I located a knife which I removed and a pack of cigarettes there was a small piece of a plastic baggie that was sticking out of the top of the cigarette pack. During the controlled purchases CHUCK would remove a small plastic bag from the pill bottle and the plastic bag would contain the Oxycodone pills he sold to the CI. When I removed the plastic bag [from] the cigarette pack I located a large amount of round blue pills in the plastic baggie. The pills were marked A 215 which I know through my training and experience to be consistent with the markings of Oxycodone 30MG pills these pills also had the same appearance and markings of the pills CHUCK had sold to the CI during the first controlled purchase.

      **I asked CHUCK where he had obtained the pills I had located on his person. CHUCK stated he had obtained the pills [from] JENKINS that day.**

D.E. 40-5 at 1-2 (emphasis added).

### C.  No Substantial Showing of a False Statement

Jenkins's entire argument in support of a *Franks* hearing is that factual discrepancies between the affidavit and case report (concerning the materials highlighted above) indicate that Det. Graves lied in the affidavit. D.E. 38 at 3. Jenkins argues that Graves said or implied in his affidavit that he saw Chadwell go *inside Jenkins's house*, whereas the case report indicates that any transaction between Chadwell and Jenkins took place near to, but outside of, Jenkins's house. *Id.* at 3-4. Jenkins states: "At no point does Graves's report specify that he observed Chadwell or

Jenkins go inside Jenkins's residence. However, Graves's affidavit in support of the search warrant states that he saw Chadwell 'leave the residence.'" *Id*. at 3-4. He argues:

> Graves's report does not indicate that Chadwell told Graves that he [obtained the pills] inside Jenkins's residence or that he even went inside the residence on the relevant date. However, Graves states in the search warrant affidavit that Chadwell told him that "he obtained the pills from [Jenkins] that day and confirmed the residence he had come from was [Jenkins's] residence."

*Id*. at 4.

The issue appears to be Det. Graves's loose employment of the word "residence." Jenkins reads the word "residence" narrowly as indicating the house. But reading Det. Graves's affidavit and report in full shows that Det. Graves uses the word "residence" to describe the house *and* the property surrounding it. This being the case, the affidavit is not ambiguous. At no point in either the affidavit or the case report does Det. Graves suggest he saw Chadwell go inside Jenkins's *house*. Accordingly, there is no contradiction between the affidavit and the case report. Jenkins's motion is premised on a misreading of the affidavit.

To restate the issue, Jenkins argues that the affidavit says Chadwell obtained drugs from Jenkins *inside Jenkins's house*. D.E. 38 at 3-4. Jenkins argues that the affidavit at least "contained statements implying that he observed Mr. Chadwell enter Mr. Jenkins's residence or otherwise engage in a drug transaction on Mr. Jenkins's property." D.E. 70 at 8. But the affidavit makes no claim or implication that Chadwell went inside Jenkins's house. Again, the affidavit states, in relevant part:

> On Jan 3, 201[8] I observed the vehicle that Chadwell was operating when the controlled purchases were conducted setting in the driveway at 654 South HWY 1223 in Corbin Ky. While conducting surveillance I observed Chadwell on the property of the residence. A short time later I observed Chadwell get into the vehicle and leave the residence. . . . Chadwell advised he obtained the pills from Jenkins that day and confirmed the residence he had come from was Jenkins residence.

D.E. 40-1 at 2.  The affidavit makes clear that Chadwell was at one point "in the driveway" at Jenkins's property.  He was "on the property of the residence."  Chadwell then left "the residence," which in context meant that he left where he had been, *i.e.*, "the driveway" and "the property of the residence."  Chadwell's statement (as recounted by Det. Graves) that "the residence he had come from was Jenkins residence," does not, in context, necessarily mean or suggest that Chadwell went inside the house.

The alleged contradiction between the affidavit and the case report simply does not exist. Neither document states Chadwell went inside Jenkins's house during the January 3, 2018 surveillance.  Instead, both documents place the January 3 transaction with Chadwell near, but outside, the house.  Accordingly, Jenkins fails to make a substantial showing that the affidavit contains a false statement or even as much as a misleading omission.  No hearing is warranted under *Franks*.

It is true that the case report includes more detail than the affidavit.  The affidavit says Det. Graves observed Chadwell "in the driveway" and "on the property of the residence."  Chadwell later returned to the vehicle registered to Jenkins and "le[ft] the residence."  The case report supplies the added detail that at some point Chadwell crossed the street and went to an area where some cars were parked and Jenkins was on a tractor and it looked like these two and a third man were removing an engine from a vehicle.  D.E. 40-5 at 1.  Jenkins argues that this area with the parked cars was not even Jenkins's property.  D.E. 70 at 3-4, 8.  It is not clear why the defense concludes that this area across the street from the house necessarily was not Jenkins's property. At the very least, this area was across from Jenkins's house and Jenkins himself was present.  It is also undisputed that Chadwell parked on Jenkins's own driveway.  Even assuming the area with the parked vehicles did not belong to Jenkins, had this information been included in the affidavit,

it would not have materially affected the probable cause analysis. The critical fact from the affidavit is that Chadwell was observed on Jenkins's property shortly before he was caught with pills that he admittedly received from Jenkins.

Jenkins argues in the alternative that a hearing is needed because the affidavit is "ambiguous."

> [I]n the event that the Court [finds the *Franks* standard not satisfied], the language Detective Graves utilized in his affidavit is sufficiently ambiguous that a hearing may assist the Court in determining its meaning. While it is true that courts "look only to the four corners of the affidavit" in assessing whether a search warrant is supported by probable cause, a hearing may provide additional context as to Graves's generalized assertions about Mr. Chadwell's activities in relation to Jenkins's residence.

D.E. 38 at 5.

Jenkins then cites three cases: "*United States v. Brooks*, 59[4] F.3d 488, 492 (6th Cir. 2010); *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003), [and] *United States v. Prince*, 57 F.3d 1071 at *2 (6th Cir. 1995) (Table)." D.E. 38 at 5. These cases do not establish that a hearing may be held to aid the Court in interpreting an ambiguous warrant affidavit.

*Brooks* contradicts the idea that a court could use testimony from a suppression hearing to help interpret a warrant affidavit. The trial court in *Brooks* held a suppression hearing. But the Court of Appeals noted that "the question of whether there was probable cause turns solely on what information was provided to the magistrate in the search warrant affidavit." Therefore, testimony from the hearing was irrelevant. *Brooks*, 594 F.3d at 490 n.1. *Brooks* also says nothing about ambiguity in a search warrant affidavit, although the warrant at issue was deemed a "slopp[y] . . . cut-and-paste job." *Id.* at 490.

*Pinson* also says nothing about ambiguity in a search warrant affidavit. The trial court in *Pinson* held an evidentiary hearing. But the defendant's motion to suppress alleged both that the

search warrant was defective and that officers violated the "knock and announce" rule. *Pinson*, 321 F.3d at 561. The Court presumes that the latter issue was what warranted a hearing.

*Prince*, an unreported old table case, notes that a hearing was held after the defendant "contended that the search warrant was ambiguous and therefore fatally defective because it lacked the specificity and clarity required by law." *Prince*, 57 F.3d 1071, at *2. The search warrant in *Prince* was unusual in that it was an anticipatory search warrant contingent on the results of a planned sting operation. *See id*. at *1-2. *Prince* is both nonbinding and readily distinguishable.

The warrant to search Jenkins's residence is not ambiguous. Even if it was ambiguous, an evidentiary hearing is not an appropriate vehicle to aid in its interpretation.

## II. Probable Cause in Support of the Search Warrant

### A. General Legal Standards

Jenkins argues that the affidavit supporting the warrant to search his residence failed to establish an adequate nexus between his residence and the criminal activity.

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. It provides, in relevant part, that, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A state search warrant being challenged in a federal court must be judged by federal constitutional standards. *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016).

When determining whether an affidavit establishes probable cause, courts look only to the four corners of the affidavit; information known to the officer but not conveyed to the magistrate is irrelevant. *Abernathy*, 843 F.3d at 249. The analysis should center on "the adequacy of what the affidavit does contain, not on what it lacks, or on what a critic might say should have been

added." *United States v. Dyer*, 580 F.3d 386, 391 (6th Cir. 2009) (quoting *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (*en banc*)).

In reviewing a magistrate's decision to issue a warrant, the Court must accord the magistrate's determination great deference. *Abernathy*, 843 F.3d at 250. The question is whether the magistrate had a "substantial basis" for finding the affidavit established probable cause. *United States v. Braden*, 248 F. App'x 700, 702 (6th Cir. 2007) (quoting *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001)). And courts should review the sufficiency of the affidavit "in a commonsense, rather than hypertechnical manner." *Greene*, 250 F.3d at 479.

To properly support a warrant, the affidavit must contain "adequate supporting facts about the underlying circumstances to show that probable cause exists." *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996). These supporting facts need not be based on the direct knowledge and observations of the affiant; they may also come from hearsay information supplied by an informant. *Id*. "From whatever source, the information presented must be sufficient to allow the official to independently determine probable cause; the judge's action cannot be a mere ratification of the bare conclusions of others." *Id*.

Probable cause is defined as reasonable grounds for belief; probable cause requires more than mere suspicion, but it does not require *prima facie* proof. *Abernathy*, 843 F.3d at 249. The critical element is that there must be reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought. *Id*.

When the request is to search for drugs, law enforcement need only show a fair probability that the drugs will be found in a particular place. *Abernathy*, 843 F.3d at 249. Put succinctly, "Probable cause exists where there is a fair probability, given the totality of the circumstances, that

contraband or evidence of a crime will be found in a particular place." *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) (quoting *Greene*, 250 F.3d at 479).

Probable cause requires a "nexus" between the place to be searched and the evidence sought. *United States v. Crawford*, 943 F.3d 297, 308 (6th Cir. 2019) (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)). The Constitution's general "nexus" requirement

> is refined when the place is a home and the evidence drugs. "[I]n the case of drug dealers," we have observed, "evidence is likely to be found where the dealers live." *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) (citation, internal quotations, and alteration omitted). And so a court issuing a search warrant "may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008).

*Crawford*, 943 F.3d at 308. This inference should apply in this case because the affidavit clearly alleges Jenkins is a drug dealer.

### B.  Text of the Affidavit

The narrative in the affidavit states:

> The affiant has information that Russell Jenkins is living at 654 South HWY 1223 in Corbin Kentucky. The affiant has received information that Jenkins is distributing Oxycodone in Laurel County. I have spoken with a source of information that advised Jenkins is obtaining Oxycodone pills from a source of supply in Michigan. The source who[se] information I have found to be reliable from past investigations stated He/She had purchased Oxycodone from Jenkins in the past. I have also conducted two controlled purchases where Oxycodone 30MG pills were purchased from Charles Chadwell. I have information that Chadwell was obtaining Oxycodone pills from Jenkins. During both controlled purchases Chadwell was operating a vehicle owned by Jenkins. On Jan 3, 201[8] I observed the vehicle that Chadwell was operating when the controlled purchases were conducted setting in the driveway at 654 South HWY 1223 in Corbin Ky. While conducting surveillance I observed Chadwell on the property of the residence. A short time later I observed Chadwell get into the vehicle and leave the residence. I had learned from the investigation on Chadwell that he had a suspended license. The Affiant and Tpr Chris Saunders U/930 conducted a traffic stop on the vehicle because Chadwell was operating the vehicle. During the traffic stop Troopers located 96 Oxycodone 30 MG tablets on Chadwells person. Chadwell advised he

11

obtained the pills from Jenkins that day and confirmed the residence he had come from was Jenkins residence.

. . . .

The affiant is familiar with the drug trafficking and has received training on prescription pill identification. The affiant has also conducted prior drug trafficking investigations.

I have obt[ai]ned a criminal history report and found Jenkins was convicted in Knox County case number 14-CR-00096 for Traffick[ing] in Controlled Substance 3rd Degree 1st Offense.

D.E. 40-1 at 2.

## C. Analysis

Jenkins argues that the affidavit "failed to establish the requisite 'nexus between the place searched and the evidence sought.'" D.E. 70 at 2. He explains that the first two controlled buys from Chadwell happened at locations other than Jenkins's residence. *Id.* at 2-3. And the January 3, 2018 transaction between Chadwell and Jenkins happened outside Jenkins's house. *Id.* at 3. The Court agrees—these are facts as stated in the affidavit.

The affidavit contains the following facts which potentially contribute to a finding of probable cause. The issue is whether they establish a sufficient nexus between Jenkins's house and the alleged drug conspiracy.

(1)   A "source of information" with a history of reliability told Det. Graves that Jenkins obtains oxycodone pills from a source in Michigan.

(2)   The same "source of information" had purchased oxycodone from Jenkins.

(3)   Det. Graves conducted two controlled oxycodone purchases from Chadwell.

(4)   Det. Graves has "information" that Chadwell's source was Jenkins.

(5)   Chadwell drove a vehicle owned by Jenkins at the time of the controlled buys.

(6)     During the January 3, 2018 surveillance, Det. Graves saw this same vehicle in the driveway at Jenkins's residential address with Chadwell nearby "on the property of the residence." Chadwell then drove the vehicle away, but officers stopped him and found 96 oxycodone tablets.

(7)     Chadwell told the officers "he obtained the pills from Jenkins that day and confirmed the residence he had come from was Jenkins['s] residence."

(8)     Jenkins had a prior conviction for third-degree drug trafficking.

Even granting Jenkins's argument that the affidavit does not identify any drug activity inside Jenkins's *house*, this information is sufficient to establish probable cause to search the house.

First, the evidence of a drug conspiracy is strong. The supporting facts include two controlled buys, the traffic stop of Chadwell during which pills were found, and the inculpatory statement of a known, reliable informant that the informant had purchased oxycodone from Jenkins.[2] Jenkins also had a prior trafficking conviction. These four clusters of facts—the controlled buys, the informant statements, Jenkins's criminal history, and the fruitful traffic stop

---

[2] When a confidential informant implicates himself in criminal activity as described in an affidavit, "[s]uch a declaration against penal interest carries its own indicia of reliability." *United States v. Rosenbarger*, 536 F.2d 715, 719 (6th Cir. 1976) (citing *United States v. Harris*, 403 U.S. 573, 583-84 (1971)); *see also United States v. Braden*, 248 F. App'x 700, 703 (6th Cir. 2007). An admission against penal interest "is a significant, and sometimes conclusive, reason for crediting the statements of an informant." *United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009) (quoting *Armour v. Salisbury*, 492 F.2d 1032, 1035 (6th Cir. 1974)). Here, the fact that the informant admits he or she illegally bought pills from Jenkins enhances the assumed reliability of that report. By admitting his or her illegal drug purchase, the informant exposed himself or herself to potential prosecution.

   Nevertheless, when information comes from a confidential informant within the criminal milieu, courts proceed with skepticism, and probable cause may hinge upon evidence of the informant's reliability, veracity, and basis of knowledge. *United States v. Ketzeback*, 358 F.3d 987, 991 (8th Cir. 2004). Aside from the self-inculpation, the affidavit provides additional reasons to credit the informant's veracity. Det. Graves states he found the source "to be reliable from past investigations." The source was also reliable in *this* investigation. The source's report that Jenkins was Chadwell's supplier was corroborated by the surveillance, traffic stop, and admissions of Chadwell on January 3, 2018. The Court should therefore credit the informant's information that Jenkins was obtaining pills from a source from Michigan and thence supplying Chadwell.

13

following surveillance—corroborate each other and provide substantial evidence of an ongoing drug conspiracy involving Chadwell and Jenkins.

Second, Jenkins and Chadwell are strongly linked. The known, reliable informant said Jenkins was Chadwell's supplier. Chadwell drove a vehicle owned by Jenkins. Det. Graves saw Chadwell outside Jenkins's house. Shortly thereafter, Chadwell was caught with pills and acknowledged he had obtained them from Jenkins at Jenkins's residence (though not inside the residence). These facts in the affidavit, including facts observed directly by Det. Graves (the surveillance and traffic stop) corroborate the informant's assertion that Jenkins and Chadwell were co-conspirators. Critically, the informant's assertion that Jenkins was the *supplier* for Chadwell is corroborated by the fact that Chadwell was stopped with 96 pills *after* being seen at Jenkins's property and even admitted that he had just obtained the pills from Jenkins.

Third, the affidavit contains facts linking Jenkins's and Chadwell's drug activities to Jenkins's residence. The known, reliable informant stated he or she had purchased oxycodone directly from Jenkins. Then, Chadwell admitted he had obtained his 96 pills from Jenkins on the day of the surveillance and that he had just come from Jenkins's residence. Det. Graves observed Chadwell "on the property of [Jenkins's] residence" just before he was stopped with the pills he said he had obtained from Jenkins. D.E. 40-1 at 2. These facts imply that Jenkins was supplying Chadwell from pills stored at Jenkins's property. Regardless of whether Chadwell entered Jenkins's house on January 3, 2018, common sense suggests that Jenkins was using his house as a home base for drug distribution. The affidavit contains no facts suggesting that Jenkins stored his pills in any other location, such as inside an automobile.

Taken together as a whole, the facts in the affidavit establish a sufficient nexus between Jenkins's house and the Jenkins-Chadwell oxycodone distribution conspiracy. This is especially

14

true when Jenkins was a known drug dealer (based on the informant's admission and Jenkins's criminal history).  When the place to be searched is a home and the evidence is drugs, "a court issuing a search warrant 'may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking.'"  *United States v. Crawford*, 943 F.3d 297, 308 (6th Cir. 2019) (quoting *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008)).  This is because, "in the case of drug dealers . . . evidence is likely to be found where the dealers live."  *Id*.  Such is clearly the case here.  The facts in the affidavit (which tie Jenkins's surveilled property to the ongoing Jenkins-Caldwell trafficking conspiracy) establish "a fair probability," given the totality of the circumstances, that drugs would be found in Jenkins's house.  *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016); *Williams*, 544 F.3d at 686.

Here, the affidavit establishes not only that Jenkins is a drug dealer (so as to support the *Crawford* inference).  Chadwell was also seen near Jenkins's home.  And Chadwell admitted at the traffic stop that he had obtained his pills from Jenkins and that he had just driven from Jenkins's residence.  Thus, the evidence here goes beyond the legally permissible inference that drug traffickers generally store drugs in their homes.  The issuing judge had more than a "substantial basis" for finding the affidavit established probable cause.  *United States v. Braden*, 248 F. App'x 700, 702 (6th Cir. 2007) (quoting *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001)).

The affidavit also establishes Jenkins and Chadwell were involved in ongoing criminal activity.  The informant had purchased drugs from Jenkins.  Det. Graves had conducted two controlled buys from Chadwell.  Det. Graves had "information" that Jenkins was Chadwell's source.  This "information" was corroborated by the January 3, 2018 surveillance, which culminated with the seizure of 96 pills in Jenkins's vehicle that was being driven by Chadwell away from Jenkins's residence.

15

Evidence of a defendant's ongoing course of unlawful conduct may make it reasonable to conclude that he keeps evidence of his illegal scheme in his home. Indeed, our cases have long established that "probable cause generally exists to search for the fruits and instrumentalities of criminal activity at the residence of a drug dealer with continual and ongoing operations." *United States v. Newton*, 389 F.3d 631, 636 (6th Cir. 2004), *vacated on other grounds*, 546 U.S. 803, 126 S .Ct. 280, 163 L.Ed.2d 35 (2005); *see United States v. Bethal*, 245 F. App'x 460, 467 (6th Cir. 2007) (explaining that evidence that a defendant "is a drug dealer with 'continual and ongoing operations' in and of itself creates probable cause to search his home"). When a warrant application presents reliable evidence that a drug-trafficking operation is ongoing, "the lack of a direct known link between the criminal activity and [dealer's] residence, becomes minimal." *Newton*, 389 F.3d at 635-36 (citing [*Greene*, 250 F.3d at 481]).

Under this continual-and-ongoing-operations theory, we have at times found a nexus between a defendant's residence and illegal drug activity with no facts indicating that the defendant was dealing drugs from his residence. For example, in *United States v. Gunter*, we held that a defendant's having engaged in regular or repetitive drug sales involving a large quantity of drugs made it "reasonable to conclude that [he] was engaged in ongoing drug trafficking," and thus "reasonable to infer that evidence of illegal activity would be found at [his] residence." 551 F.3d 472, 481 (6th Cir. 2009). We have also found a nexus between drug activity and a defendant's residence based on the defendant's record of past drug convictions coupled with recent, reliable evidence of drug activity. *See United States v. Miggins*, 302 F.3d 384, 393 (6th Cir. 2002) (upholding search of the defendant's residence as supported by probable cause based on his prior cocaine-related convictions coupled with officers' same-day observations of the defendant's signing for a package containing a large amount of cocaine delivered at someone else's residence).

*United States v. McCoy*, 905 F.3d 409, 417-18 (6th Cir. 2018). This ongoing-criminal-activity rule provides additional weight to the finding of probable cause to search Jenkins's home.

Jenkins argues that this warrant should be invalidated like the warrants in *Brown* and *Higgins*. D.E. 70 at 4-7. These two cases are frequently distinguished on their facts, as should be done here.

In *Higgins*, the Sixth Circuit found that the search warrant affidavit at issue did not establish probable cause to search the defendant's apartment. *United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009). But the search was upheld under the "good faith" exception. *Id.* at 391.

16

*Higgins* involved a traffic stop that uncovered a large quantity of cocaine. *Higgins*, 557 F.3d at 385. The driver stated he had obtained the cocaine from Higgins and gave the address where the transaction took place—Higgins's apartment. The affidavit reported that Higgins had two prior convictions for narcotics trafficking. *Id.*

The affidavit in *Higgins* included a self-inculpatory statement by an informant whose identity was known. But the Court found probable cause lacking: the affidavit did not assert the informant had been reliable in the past and the informant under the circumstances had an incentive to cooperate with police. *Higgins*, 557 F.3d at 390. The Court found that "the fact that the informant was known to the affiant and issuing magistrate and admitted a crime does not *alone* provide probable cause." *Id.* (emphasis added).

The *Higgins* Court also found the "nexus" lacking because the affidavit did not assert that the informant had been inside the apartment or that the informant had seen evidence of any crime at the apartment other than the single alleged drug sale. *Higgins*, 557 F.3d at 390. It appears that the informant's lack of established credibility negatively impacted the strength of the "nexus." *See United States v. Stone*, 676 F. App'x 469, 474 (6th Cir. 2017) (observing the *Higgins* Court found "no nexus because reliability of informant who identified defendant's residence as part of a drug trafficking operation was not established"); *accord United States v. Neal*, 577 F. App'x 434, 442 (6th Cir. 2014).

The affidavit in this case is stronger than the one in *Higgins*. First, the informant's reliability is more firmly established. Not only was the informant known to Det. Graves, and not only were the informant's statements inculpatory, but Det. Graves considered the informant "reliable from past investigations." D.E. 40-1 at 2. The informant's key information, that Jenkins was a drug dealer, was also corroborated by Chadwell's admission that Jenkins was his supplier.

17

Second, the nexus here is also stronger. The nexus to Jenkins's residence is not based solely on the uncorroborated statement of an informant who was caught red-handed. Instead, the nexus to Jenkins's residence was based primarily on Det. Graves's own surveillance of Jenkins's property. *See United States v. Gill*, 685 F.3d 606, 610 (6th Cir. 2012) (distinguishing *Higgins* on the basis that officers corroborated "key elements" of the informant's tip). Det. Graves observed Chadwell at Jenkins's property and believed he was there to obtain drugs from Jenkins. And Chadwell admitted as much during the traffic stop: "Chadwell advised he obtained the pills from Jenkins that day and confirmed the residence he had come from was Jenkins residence." *See United States v. Coleman*, 923 F.3d 450, 458 (6th Cir. 2019) (distinguishing *Higgins* as not involving an active drug dealer and when "the informant was reliable, having conducted multiple controlled buys . . . and law-enforcement agents independently established that Coleman delivered cocaine shortly after leaving his house"), *cert. denied*, 205 L. Ed. 2d 360 (Nov. 25, 2019). This case is not like *Higgins*, where "all the evidence in the affidavit came from an informant whose reliability was not established." *United States v. Raglin*, 663 F. App'x 409, 412 (6th Cir. 2016).

The warrant in *Higgins* was upheld only under the "good faith" exception, but here the warrant solidly establishes probable cause, particularly because there was ongoing criminal activity and the residence was surveilled. "[U]nlike the facts in *Higgins*, where the affidavit was based on uncorroborated informant statements, the affidavit in this case was based on facts directly determined by the investigating officers." *United States v. Sneed*, 385 F. App'x 551, 558 (6th Cir. 2010).

The *Brown* case is also distinguishable. The *Brown* Court reasoned as follows:

> In the present case, the search warrant affidavit contained no evidence that Brown distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there. The affidavit did not suggest that a reliable confidential informant had purchased drugs there, that the police had ever

conducted surveillance at Brown's home, or that the recorded telephone conversations linked drug trafficking to Brown's residence. The Government notes that Brown's car, which was registered to his residence, was parked outside [a drug dealer's] home and tested positively for narcotics during a canine search. Although these facts supported the search of Brown's car, they did not establish a fair probability that evidence of drug trafficking would be found at his residence. A more direct connection was required, such as surveillance indicating that Brown had used the car to transport heroin from his home to Middleton's on the day in question. The mere fact that the car was registered to Brown's home was too vague and generalized a nexus to support the search warrant.

*United States v. Brown*, 828 F.3d 375, 382-83 (6th Cir. 2016).

The affidavit before this Court provided evidence linking oxycodone distribution to Jenkins's residence. This is different from *Brown*, where "the affidavit [was] devoid of facts connecting the residence to the alleged drug dealing activity." *Brown*, 828 F.3d at 385. Here, Det. Graves surveilled a co-conspirator in an apparent ongoing drug trafficking operation "on the property of [Jenkins's] residence." D.E. 40-1 at 2. After the co-conspirator (Chadwell) drove away, he was stopped and found in possession of 96 oxycodone pills. Chadwell admitted "he obtained the pills from Jenkins that day and confirmed the residence he had come from was Jenkins['s] residence." *Id.* The nexus here is clearly stronger than in *Brown*. *See United States v. White*, 874 F.3d 490, 505 (6th Cir. 2017) (distinguishing *Brown*). This is a case in which the legal inference—that drug dealers use their homes to facilitate their drug trafficking—fits quite comfortably. *See United States v. Crawford*, 943 F.3d 297, 308 (6th Cir. 2019). Even though Chadwell was not seen going inside Jenkins's house, the affidavit established probable cause that evidence of trafficking would be found within. Unlike *Brown*, the affidavit contained evidence that "suspicious activity had taken place [at the defendant's home]." *Brown*, 828 F.3d at 383. Under these circumstances, there was "a fair probability, given the totality of the circumstances, that contraband or evidence of a crime [would] be found [in Jenkins's home]." *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008). This "fair probability" particularly exists in light of

the great deference this Court must extend to the issuing judge's decision. *Abernathy*, 843 F.3d at 250. The affidavit provided a "substantial basis" for that judge to find a "fair probability" that Jenkins's home would contain evidence of drug trafficking. *Greene*, 250 F.3d at 478.

### III. Good Faith

Even if the warrant failed to establish probable cause (which includes an appropriate nexus to Jenkins's residence), the good-faith exception would save the search from the exclusionary rule. The good-faith inquiry is confined to "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Higgins*, 557 F.3d 381, 391 (6th Cir. 2009) (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)). The conclusion that the officers' reliance on the warrant was objectively reasonable requires a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause. *Id.*

The exclusionary rule serves to deter police misconduct. *Leon*, 468 U.S. at 916. Application of the exclusionary rule requires the reviewing court to balance the deterrence benefits of suppression with its heavy costs, focusing on the "flagrancy of the police misconduct" at issue. *Davis v. United States*, 564 U.S. 229, 237-38 (2011) (quoting *Leon*, 468 U.S. at 909, 911). "[T]he deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." *Id.* at 238 (quoting *Herring v. United States*, 555 U.S. 135, 143 (2009)). When police act with deliberate, reckless, or grossly negligent disregard for the Fourth Amendment, "the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (quoting *Herring*, 555 U.S. at 144).

Jenkins nowhere argues in his briefing that the good-faith exception does not apply. *See* D.E. 33, 38, 70. In this case, as in *Higgins*,

> there is no evidence that any circumstances are present that would negate the good-faith exception.  There is no evidence that [Det. Graves] included false information in the affidavit; there is no evidence that the magistrate acted as a partisan rubber stamp; the affidavit . . . is not bare bones, and this court's precedents are not so clear as to make it "entirely unreasonable" to find probable cause based on such an affidavit; and there has been no showing that the warrant was so obviously deficient that official reliance on it was objectively unreasonable.

*Higgins*, 557 F.3d at 391.  For the good-faith exception to apply, an affidavit need only present "*some* connection, regardless of how remote it may have been," *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017) (quoting *United States v. Laughton*, 409 F.3d 744, 750 (6th Cir. 2005)), or, in other words, establish a "minimally sufficient nexus between the illegal activity and the place to be searched," *United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016) (quoting *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc)).  Such is the case here.

Even assuming the warrant was invalid for lack of probable cause, there was no police misconduct here, much less flagrant misconduct.  Thus, in the alternative, the officers executing the warrant did so in good faith.

### IV.  Suppression of Statements

To the extent that Jenkins argues his statements to law enforcement were the fruit of the poisonous tree, this claim fails.  Because the search was valid, the invalidity of the search cannot be a basis for suppressing Jenkins's subsequent incriminating statements.  *See* D.E. 33 at 2 (suggesting Jenkins's "verbal evidence" was the "fruit" of official illegal activity).

Jenkins argues for the first time in his reply brief that his statements were coerced in violation of the Due Process Clause and were given in the context of an unlawful interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  D.E. 70 at 9-11.

"Generally speaking, arguments raised for the first time in reply briefs are waived." *Palazzo v. Harvey*, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019).

Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived.

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (quoting *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)). Illustrative of this point, the government in this case found itself at a loss to respond to Jenkins's request that the Court suppress his statements. D.E. 40 at 5. Jenkins has effectively waived his Due Process and *Miranda* arguments by omitting them from his original motion.

Even if his self-incrimination argument was not waived, Jenkins has not explained how *Miranda* was violated during his conversations with law enforcement. D.E. 70 at 11. He nowhere states that *Miranda* warnings were required but not given. He does not even address the threshold *Miranda* question of whether he was in custody. *See Stansbury v. California*, 511 U.S. 318, 322 (1994). Several factors guide this inquiry: "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). Jenkins nowhere addresses these critical factors. The claim is insufficiently developed, even if it were not waived.

Even if his Due Process argument was not waived, Jenkins provides no facts to support his argument that his "will was overborne." D.E. 70 at 11. The Sixth Circuit has established three requirements to prove that a confession was involuntary: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). Relevant factors include

the defendant's age, education and intelligence; whether the defendant has been informed of his

constitutional rights; the length and extent of the questioning; and the use of physical punishment,

such as the deprivation of food and sleep. *Id*. at 422-23.

Instead of addressing these standards, Jenkins's argument collapses again into a claim that

his statements were the result of an "unlawful intrusion" into his home. *Id*. The only facts Jenkins

points to in the context of this argument are that he

> was questioned by Detective Graves and ATF Special Agent Todd Tremaine during
> execution of the search warrant at his residence. *See* [R. 33-4: 1-3-2018 Crime
> Supplement Narrative, Page 2]. While inside Mr. Jenkins's home, Graves
> contacted Mr. Jenkins and told him that he "needed to speak with him." *Id*. Graves
> and Agent Tremaine subsequently asked Mr. Jenkins a number of incriminating
> questions about his prior involvement in narcotics trafficking. *Id*.
>
> . . . .
>
> Officers were within Mr. Jenkins's home and actively engaged in a search. Graves
> informed Mr. Jenkins of the circumstances and directed him to return to answer
> questions. Officers remained in Mr. Jenkins's home and continued their efforts
> while the questioning occurred.

*Id*. at 10-11. The Court is at a loss to explain how this narrative evinces a violation of Jenkins's

Due Process rights.

The Court has no obligation to craft Mr. Jenkins's Due Process and *Miranda* arguments

for him. These arguments are not only waived; they are insufficiently developed for the Court to

meaningfully review. As such, they should be denied.

### V. Conclusion

For the reasons discussed above, the undersigned **RECOMMENDS** that Defendant's

motion to suppress (D.E. 33) be **DENIED.**

The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

The parties should consult that statute and Federal Rule of Criminal Procedure 59(b) concerning

the right to appeal to the District Judge.  Any objection must be filed within **fourteen days** of the entry of this order.  Failure to object per Rule 59(b) waives a party's right to review.  Upon expiration of that fourteen-day period, this matter will be submitted to Judge Boom for her consideration.

This the 11th day of March, 2020.

Signed By:

*Hanly A. Ingram*

**United States Magistrate Judge**